IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DIEBOLD INCORPORATED, et al., | ) | CASE NO. 5:16-cv-02481 |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| QSI, INC., | ) | |
| | ) | **MEMORANDUM OPINION** |
| Defendant. | ) | **AND ORDER** |

## I. Introduction

Plaintiffs Diebold Incorporated and Diebold Self-Service Systems (collectively, "Diebold") supply end users, such as banks, with Diebold-branded Automated Teller Machines ("ATMs"). They also own copyrights to certain ATM software programs. Defendant QSI, Inc. ("QSI"), is a third party servicer of ATMs and buys parts from Diebold.

Diebold's Complaint accuses QSI of copyright infringement, misappropriation of trade secrets, and breach of contract. Doc. 1. Diebold alleges that QSI improperly made copies of Diebold's copyrighted ATM software programs. Doc. 1. QSI has filed a counterclaim, seeking a declaratory judgment that the licensing agreements Diebold enters with end users authorize QSI to make backup copies. Doc. 12. QSI alleges that, as an agent of its end user customers, it is a third party beneficiary of the licensing agreements, which allow end users to create backup

copies of the software programs. Doc. 12, p. 8, ¶¶ 13-14, and p. 10, ¶ 23. QSI further alleges that Diebold personnel knew of, and acquiesced in, QSI's creation of backup copies, which it left in the possession of the end users. Id., p. 8, ¶ 15.

Diebold has filed a Motion to Dismiss QSI's Counterclaim ("Motion") under Fed. R. Civ. P. 12(b)(1). Diebold has submitted with its Motion a copy of the master licensing agreement it enters with end users. Diebold argues, based on the terms of that agreement, that QSI lacks standing to assert its Counterclaim, and the Court thus lacks subject matter jurisdiction, "because QSI is neither a party to nor a third-party beneficiary under the license agreements." Doc. 15, p. 1. The Motion has been fully briefed.

As is more fully explained below, Rule 12(b)(1) does not permit a factual attack on the Court's subject matter jurisdiction that implicates the merits of the claim sought to be dismissed. Because the Motion is such an attack, it fails. Accordingly, the Court **DENIES** Diebold's Motion to Dismiss.

## II. Background

**Diebold's Complaint**: Diebold alleges that it is the owner of all right, title and interest, including copyrights, in numerous computer programs used with ATMs. Doc. 1, p. 2, ¶¶ 9-10. Diebold refers to its alleged copyrighted works of computer software collectively as "Agilis Computer Programs". Doc. 1, p. 2, ¶ 10. Diebold asserts that Diebold and QSI were parties to a Parts Supply Agreement, which allowed QSI to purchase ATM parts but prohibited any unauthorized possession or use of Diebold's Agilis Computer Programs, or any other Diebold software. Doc. 1, p. 3, ¶ 12. Diebold alleges that "contrary to the provisions of the Parts Supply Agreement, QSI has and continues to engage in the practice of possessing and using Diebold's Agilis Computer Programs and other software residing on Diebold brand ATMs owned by

banks." Doc. 1, p. 3, ¶ 13. Also, Diebold alleges that "QSI's regular practice is to have its technicians copy Diebold's software, including the Agilis Computer Programs, on to laptop computers or other storage devices, which are then used by QSI's technicians to provide service and maintenance for Diebold brand ATMs, all in violation of the Parts Supply Agreement and Diebold's copyrights." Doc. 1, p. 3, ¶ 15.

**QSI's Counterclaim**: QSI asserts that it "has service and maintenance agreements with various end users of Diebold ATMs[]"[1] and "[f]or QSI customers who have entered into a Diebold master licensing agreement, QSI provides comprehensive service and maintenance, including creation of backup copies of the Agilis Computer Programs, in accordance with their particular master licensing agreements." Doc. 12, p. 8, ¶¶ 10-11. Further, QSI asserts that "[a]s an agent of end users of Diebold ATMs who have entered into master licensing agreements QSI is a third party beneficiary of those agreements[]" and "QSI has created backup copies of Agilis Computer Programs in full conformity with the master licensing agreements entered into by its customers, which allow an end user of Diebold ATMs to create backup copies of Agilis Computer Programs to be possessed and used by that end user in the event a Diebold ATM's software 'crashes.'" Doc. 12, p. 8, ¶¶ 13-14. QSI also alleges that it created backup copies of the software, which it left with the end users, "with the full knowledge, acquiescence and even explicit instruction of Diebold software support personnel." Id., p. 8, ¶ 15.

QSI's Prayer for Relief seeks a judgment:

> declaring that the [Diebold] master licensing agreements . . . grant QSI the authority to create backup copies of the Agilis Computer Programs to be possessed and used by . . . end users in the event a

[1] Diebold and QSI apparently compete with respect to servicing Diebold-branded ATMs. QSI's Chief Executive Officer states, in his Declaration submitted with QSI's Opposition Brief, that end users often "lack the in-house expertise to provide service for their ATMs, and customarily enter into service agreements either with the manufacturer or with a third party service provider such as QSI." Doc. 18-1, p. 2, ¶ 4.

> Diebold ATM's software crashes and that QSI's previous and current use of the . . . Programs otherwise comports with applicable law.

Doc. 12, p. 11, ¶ 5.

**Diebold's Motion to Dismiss**: Diebold's Motion is a factual, as distinguished from a facial, attack under Fed. R. Civ. P. 12(b)(1) on the Court's subject matter jurisdiction. Doc. 15-1, pp. 4-5. The Motion relies on evidence, specifically the terms of the Diebold Comprehensive Agreement ("DCA"),[2] to argue that QSI is not a third-party beneficiary under that agreement and therefore lacks standing to bring its counterclaim. *See* id., pp. 1-3, 6-7.

In its Motion, Diebold states, "When most customers purchase ATMs from Diebold they typically enter into" the DCA, which "includes provisions that address the licensing terms for the ATM software." Id., p. 2. Diebold contends that those provisions provide that the "only entity that receives a license and any rights related to Diebold's software is the Customer, i.e., the entity that is actually a party to the agreements[,]" "only the Customer is authorized to make a backup copy of the ATM software, and the Customer is only allowed to make one backup copy[,]" and "Customer agrees not to transfer the Software to anyone other than Diebold, not to lend, rent, or lease any of the Software, not to allow a third party to operate or access the Software, and not to move a copy of the Software from one computer or device to another." Id., pp. 6-7 (emphasis in original). In reliance upon those provisions, Diebold argues that "[t]he express terms of the [DCA] clearly establish that Diebold had no intention that QSI or any other third party should benefit in any way from its customer contracts . . . [and] preclude the

[2] Diebold has attached a copy of the DCA to the Motion accompanied by a declaration of its attorney attesting to its authenticity. Docs. 15-2, 15-3. Diebold states that the DCA "is what QSI refers to in its counterclaim as the 'Diebold master licensing agreement.'" Doc. 15-1, p. 3. QSI has submitted a Declaration agreeing that the DCA submitted by Diebold "is in material form the same as the agreement referred to in QSI's Counterclaim and as to which QSI seeks a declaratory judgment" and that "the terms at issue in this action are identical to the terms" in the DCA submitted by Diebold. Doc. 33-1, p. 1, ¶ 3.

Customer from allowing any third party – such as QSI – from accessing and making backup copies of the Diebold software." Id., p. 7.

QSI opposes Diebold's Motion, arguing that it has Article III standing to assert its counterclaim and that "[a]s an authorized agent for Diebold's Customers, under the terms of the [DCA], QSI has the authority to create backup copies of the Agilis Computer Programs to be possessed and used by those Customers in the event a Diebold ATM's software crashes." Doc. 18, pp. 1-2, 4.

## III. Law and Analysis

### A. Standing

Article III of the Constitution limits a federal court's jurisdiction to consideration of cases and controversies. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992). "Standing is an essential and unchanging part of the case-or-controversy requirement of Article III[,]" *Lujan*, 504 U.S. at 560, and is a jurisdictional requirement, *National Organization for Women, Inc. v. Scheidler*, 510 U.S. 249, 255 (1994); *see also Binno v. American Bar Association*, 826 F.3d 338, 344 (6th Cir. 2016) ("Standing is, of course, a threshold requirement for federal jurisdiction."). Thus, a "litigant [must] have 'standing' to challenge the action sought to be adjudicated in the lawsuit." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471 (1982). "The term 'standing' subsumes a blend of constitutional requirements and prudential considerations[.]" *Id.*

"[T]he irreducible constitutional minimum of standing contains three elements." *Lujan*, 504 U.S. at 560; *see also Valley Forge Christian College*, 454 U.S. at 472. First, the party must have suffered an injury in fact, i.e., an invasion of a legally protected interest, which is concrete and particularized and actual or imminent as opposed to conjectural or hypothetical. *Lujan*, 504

U.S. at 560. Second, there has to be a causal connection between the injury and the conduct complained of, i.e., the injury must be fairly traceable to the conduct of the opposing party. *Id.* Third, it must be likely, as opposed to only speculative, that the injury will be redressed by a favorable decision. *Id.* at 561. The burden of establishing these elements rests with the party invoking federal jurisdiction. *Id.*

In addition to the constitutional requirements, federal courts also take into account prudential considerations when considering the question of standing. *Valley Forge Christian College*, 454 U.S. at 474-475; *see also Smith v. Jefferson County Bd. of School Com'rs*, 641 F.3d 197, 206 (6th Cir. 2011) (discussing prudential requirements for standing developed by the Supreme Court). First, a party generally must assert its own legal rights and interests and cannot base its legal claim on the legal rights and interests of third parties. *Valley Forge Christian College*, 454 U.S. at 474. Second, a party's claim must be more than a generalized grievance. *Id.* at 474-475. Third, a party's "complaint [must] fall within 'the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" *Id.*

The Declaratory Judgment Act expressly refers to the constitutional requirement of standing, stating that, "in a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." *Medlmmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126 (2007) (quoting 28 U.S.C. § 2201(a)). Thus, "[w]hen seeking a ruling under the Declaratory Judgment Act, [a party] must also demonstrate standing pursuant to the statute." *Motsinger v. Nationwide Mut. Ins. Co.*, 920 F.Supp.2d 637, 642-643 (D. S.C. 2013) (addressing constitutional and Declaratory Judgment Act standing). "[T]he phrase 'case of actual controversy' in the [Declaratory Judgment] Act refers to the type of 'Cases' and

'Controversies' that are justiciable under Article III." *MedImmune,* 549 U.S. at 126 (internal citations omitted). Thus, "[t]o establish standing under the Declaratory Judgment Act, there must be an 'actual controversy' in a constitutional sense." *Ampro Industries, Inc. v. Dr. Farrah Gray Pub., LLC,* 2013 WL 5426257, * 2 (W.D. Tenn. Sept. 26, 2013) (relying on *National Rifle Ass'n of America v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997)). To determine whether a declaratory judgment action satisfies the case or controversy requirement, the question is "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc.*, 549 U.S. at 127 (relying on *Maryland Casualty Co. v. Pacific Coal & Oil, Co.*, 312 U.S. 270, 273 (1941)).

**B. Motion to Dismiss standard**

A party may challenge a federal court's jurisdiction under Fed. R. Civ. P. 12(b)(1) through either a facial attack or a factual attack. *Gentek Bldg. Products, Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007); *see also Vantu v. Echo Recovery, L.L.C.*, 85 F.Supp.3d 939, 941 (N.D. Ohio 2015).

"A facial attack on the subject-matter jurisdiction alleged in the complaint questions merely the sufficiency of the pleading" *Gentek Bldg. Products, Inc.*, 491 F.3d at 330. Thus, "[w]hen reviewing a facial attack, a district court takes the allegations in the complaint as true[.]" *Id.* If the allegations in the complaint "establish federal claims, jurisdiction exists." *Id.*

In contrast, when a factual attack on the court's subject-matter jurisdiction is made, "no presumptive truthfulness applies to the allegations." *Id.* "[T]he district court must weigh the conflicting evidence to arrive at the factual predicate that subject-matter does or does not exist." *Id.* "[T]he district court has wide discretion to allow affidavits, documents, and even a limited

evidentiary hearing to resolve jurisdictional facts." *Id.* "But a district court engages in a factual inquiry regarding the complaint's allegations only when the facts necessary to sustain jurisdiction do not implicate the merits of the plaintiff's claim." *Gentek Bldg. Products, Inc.*, 491 F.3d 330 (internal citations omitted and emphasis supplied). Thus, "[i]f . . . an attack on subject-matter jurisdiction also implicates an element of the cause of action, then the district court should '*find that jurisdiction exists* and deal with the objection as a direct attack on the merits of the plaintiff's claim.'" *Id.* (emphasis in original) (internal citations omitted); *see also Vantu*, 85 F.Supp.3d at 942 ("Rule 12(b)(1) does not permit a factual attack on the court's subject-matter jurisdiction when, as is the case here, the attack 'implicates the merits of the plaintiff's claim.'") (quoting *Gentek Bldg. Products, Inc.*, 491 F.3d at 330); *Nadeau v. Nye*, 934 F.Supp.2d 932, 936 (N.D. Ohio 2013) (relying on *Gentek Bldg. Products, Inc.*, 491 F.3d at 330); *American Civil Liberties Union v. Mote*, 423 F.3d 438, 441, n. 1 (4th Cir. 2005) (When declining to decide the question of standing, the court stated, "when the contested basis for jurisdiction is also an element of a plaintiff's federal claim . . . the claim should not be dismissed for lack of jurisdiction.").

**C. Analysis**

Among its claims, Diebold asserts that QSI infringed Diebold's copyrights by copying, reproducing and/or distributing Diebold's unpublished copyrighted Agilis Computer Programs. Doc. 1, p. 4, ¶ 17. In its Counterclaim, QSI asserts that:

> There exists between QSI and Diebold a substantial controversy regarding the scope of permissible activities of QSI under the master licensing agreements entered into between Diebold and end users of Diebold ATMs regarding use of the Agilis Computer Programs [and] [t]he controversy between the parties is of sufficient immediacy to justify exercise of this Court's discretion under 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57 to issue a declaratory judgment regarding the scope of permissible activities of QSI under the master licensing

> agreements entered into between Diebold and end users of Diebold ATMs regarding use of the Agilis Computer Programs.

Doc. 12, p. 10, ¶¶ 21-22.

Diebold's Motion challenges QSI's standing to assert its Counterclaim, arguing:

> QSI is not a third-party beneficiary to Diebold's licensing agreements with its customers, and therefore QSI has no standing to assert its counterclaim for a declaration of rights under those agreements. QSI simply has no rights and therefore no standing to assert any, and its counterclaim should be dismissed with prejudice.

Doc. 15-1, p. 6.

The Court finds that the facts alleged in QSI's Counterclaim "show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Medlmmune, Inc.*, 549 U.S. at 127. Thus, QSI has standing to seek a ruling under the Declaratory Judgment Act, 28 U.S.C. § 2201. *See e.g., Motsinger*, 920 F.Supp.2d 637, 642-643 (denying motion to dismiss and holding that insurer had standing to assert counterclaim seeking a declaratory judgment regarding insured's entitlement to Class I policyholder status where the insured's claim to that status was based on her alleged common law marriage). *Oppenheimer v. Maestro Music, Inc.*, 2015 WL 12086085, * 4 (N.D. Ga. June 5, 2015), is a case that bears some factual similarity to this one and is also instructive. Plaintiff Oppenheimer alleged that defendant Maestro Music infringed his copyrights to photographs of live musical performances. Maestro Music filed a declaratory judgment counterclaim alleging that Oppenheimer had uploaded his photographs to two websites and that Maestro's use of the photographs was lawful either through a license or implied license

with the websites. The Court denied Oppenheimer's motion to dismiss the counterclaim, rejecting his argument that defendant lacked standing.[3]

Diebold argues that QSI is neither a party to nor an intended third-party beneficiary under the DCA and therefore lacks standing to assert its counterclaim. Doc. 15-1, pp. 5-7. QSI contends that it satisfies the requirements for Article III standing, arguing that (1) Diebold's lawsuit against QSI constitutes a "concrete and particularized" actual injury-in-fact; (2) the injury is traceable to Diebold by virtue of Diebold's filing of its Complaint; and (3) a decision favorable to QSI on its declaratory judgment counterclaim, i.e., that it is a third-party beneficiary of the DCA, will redress QSI's injury. Doc. 18, p. 4. Diebold does not challenge these assertions nor does Diebold specifically discuss or address Article III standing. Instead, Diebold relies on an Ohio court of appeals' decision for the proposition that, "As a general rule a non-party may not assert contract rights unless it is a third-party beneficiary under the contract or such standing is conferred by statute." Doc. 15-1, p. 5 (citing and quoting *City of Akron v. Castle Aviation, Inc.*, 1993 WL 191966, at *2 (Ohio Ct. App. June 9, 1993).

Diebold correctly states that, under Ohio law, a non-party to a contract generally must be a third-party beneficiary of the contract in order to have enforceable rights under the contract. *See Castle Aviation, Inc.*, 1993 WL 191966, at *2; *see also Huff v. FirstEnergy Corp.*, 130 Ohio St.3d 196, 200 (2011). However, "Rule 12(b)(1) does not permit a factual attack on the court's subject-matter jurisdiction when . . . the attack 'implicate[s] the merits of the plaintiff's claim'." *Vantu*, 85 F.Supp.3d at 942 (quoting *Gentek Bldg. Products, Inc.*, 491 F.3d at 330). For example, in *Vantu*, 85 F.Supp.3d at 941, defendant argued that, because it was not a "debt collector" under the FDCPA, the court lacked subject matter jurisdiction to hear a claim alleging

[3] The plaintiff challenged standing on the basis that the defendants' asserted injury was speculative. *Oppenheimer*, 2015 WL 12086085, * 3.

that it violated the FDCPA. The court rejected the defendant's argument, concluding that whether the defendant was, in fact, a debt collector went to the merits of the plaintiff's FDCPA claim, not the court's power to adjudicate the claim.

Similarly, here, the question whether QSI is a third-party beneficiary of the DCA or otherwise lawfully made backup copies of Diebold's software goes to the merits of QSI's counterclaim, not the Court's ability to adjudicate the claim. The answer to that merits question will be determined at a later date. For the reasons set forth herein, at this juncture, dismissal based on lack of standing is not warranted.

## IV. Conclusion

Based on the foregoing analysis, the Court finds that it has jurisdiction over QSI's Counterclaim. Accordingly, Diebold's Motion to Dismiss (Doc. 15) QSI's declaratory judgment Counterclaim for lack of subject matter jurisdiction is **DENIED**.

July 28, 2017

Kathleen B. Burke
U.S. Magistrate Judge